USDC SCAN INDEX SHEET











WRIGHT

TECHNICAL SUPPORT

ELC   4/15/98   9:56
3:98-CV-00709
*1*
*CMP.*

1   SCOTT W. WELLMAN, STATE BAR NO. 82897
    SHANNON G. MATHEW, STATE BAR NO. 185355
2   WELLMAN & WARREN LLP
    Attorneys at Law
3   4 Venture, Suite 325
    Irvine, California 92618-3325
4
    Telephone: 714-450-0662
5   Facsimile: 714-450-0750

6   Attorneys for Tim Wright, The Support Centre, Lionel Berthiaume,
    Richard Berthiaume, The Software Place, C.J. Channing, Computer
7   Support Services, Judy Thornell, Baytek, Marsha Roudabush, MicroTech
    Software Support & Training, Inc., Kim Clement, Accounting
8   Conversions, Cyberoffice Technologies, L.L.C.

9

10              UNITED STATES DISTRICT COURT

11          SOUTHERN DISTRICT OF CALIFORNIA

12                                          '98 CV 0709 IEG

    TIM   WRIGHT,  an  individual;  THE]   Case No:
13  SUPPORT   CENTRE,   a  partnership;]
    LIONEL  BERTHIAUME,an  individual;]    COMPLAINT  FOR  DAMAGES  AND
14  RICHARD BERTHIAUME, an individual;]    INJUNCTION FOR:
    THE   SOFTWARE   PLACE,   INC.  a]     1. BREACH OF CONTRACT
15  Massachusetts  corporation;  C.J.]     2. FRAUD
    CHANNING   DBA  COMPUTER  SUPPORT]     3. UNFAIR BUSINESS PRACTICES
16  SERVICES;   JUDY   THORNELL,   an]     4. NEGLIGENT
    individual;   BAYTEK,   a   sole]         MISREPRESENTATION
17  proprietorship; MARSHA ROUDABUSH,]     5. ACCOUNTING
    an individual; MICROTECH SOFTWARE]     6. CONSPIRACY
18  SUPPORT & TRAINING, INC., an Ohio]     7. BREACH OF COVENANT OF
    corporation;   KIM   CLEMENT,  an]        GOOD FAITH AND FAIR
19  individual; ACCOUNTING CONVERSIONS,]       DEALING
    a   sole   proprietorship;   and]     8. BREACH OF EXPRESS
20  CYBEROFFICE TECHNOLOGIES, L.L.C.  ]       WARRANTY
                                      ]     9. BREACH OF IMPLIED
21                    Plaintiffs,     ]        WARRANTIES OF FITNESS AND
    v.                                ]        MERCHANTABILITY
22                                    ]     10.FALSE, MISLEADING, OR
    TECHNICAL  SUPPORT GROUP, INC., a]        DECEPTIVE ADVERTISING
23  Virginia   Corporation;  SOFTWARE]     11.NEGLIGENCE PER SE
    SOLUTIONS, INC., a business entity,]
24  form unknown; PETER LAVERGNE DBA]
    SOFTWARE   SOLUTIONS,   INC.;  PETER]
25  LAVERGNE,   an   individual;   SHAWN]
    CORRIVEAU, an individual,        ]
26                                    ]
                      Defendants.     ]
27  _____ ]

28                                          1

1    Prior to the commencement of this action, certain exclusive
2    dealerships were sold by defendants Peter Lavergne and/or Technical
3    Support Group, Inc., Software Solutions, Inc., Peter Lavergne DBA
4    Software Solutions, Inc., Shawn Corriveau to the following persons and
5    entities: Tim Wright, The Support Centre, Lionel Berthiaume, Richard
6    Berthiaume, The Software Place, Inc., C.J. Channing, Computer Support
7    Services, Judy Thornell, Baytek, Marsha Roudabush, MicroTech Software
8    Support & Training, Inc., Kim Clement, Accounting Conversions, Timy
9    Tancey, Tancey & Associates, Larry Rizo, Algorithms, Inc., Eli Yaron,
10   Data Flow Information Systems, John Ristaino, Excel Business
11   Strategies, Bill McGuire, WJM Computer Sales, Jeff Craig, Craig's
12   Video, Tom Macauley, SKS Consulting Inc., Bette Harbin, CSI, R.J.
13   Gosselin, Computer Source 1, Gary Ketchum, Custom Computer Solutions,
14   Inc., Mike Canfield, CPA, Damon L. Walker, New South Solutions, Chris
15   Bellacose, Interactive Information Services, Joel Stern, Unique
16   Services, Inc., Michael Carroll, Power Tools for Business, L.L.C.,
17   Jennifer Obrien, and JCS Computer Resource Corp.

18       In or around September and October of 1997, each of the preceding
19   persons or entities assigned their exclusive dealerships to
20   Cyberoffice Technologies, L.L.C. ("Cyberoffice"). As assignee of these
21   exclusive dealerships, Cyberoffice is now bringing suit for any and
22   all claims arising from the time of the assignments until the present.

23       Of the above-named persons and entities, Tim Wright, The Support
24   Centre, Lionel Berthiaume, Richard Berthiaume, The Software Place,
25   Inc., C.J. Channing, Computer Support Services, Judy Thornell, Baytek,
26   Marsha Roudabush, MicroTech Software Support & Training, Inc., Kim
27   Clement, and Accounting Conversions, are also bringing suit in their
28

1  own right against defendants Peter Lavergne and/or Technical Support

2  Group, Inc., Software Solutions, Inc., Peter Lavergne DBA Software

3  Solutions, Inc., Shawn Corriveau for any and all claims arising from

4  the time they entered into the exclusive dealerships with the

5  defendants to the date of the assignment of these exclusive

6  dealerships to Cyberoffice.

7  ///

8  <center>**JURISDICTION AND VENUE**</center>

9     1.  This is an action for breach of contract, fraud, unfair

10  business practices, negligent misrepresentation, accounting,

11  conspiracy, breach of covenant of good faith and fair dealing, breach

12  of express warranty, breach of implied warranties of fitness and

13  merchantability, false, misleading or deceptive advertising, and

14  negligence per se.

15     2.  This court has jurisdiction of this action pursuant to 28

16  U.S.C. §1332 as there is complete diversity between all plaintiffs on

17  the one hand and all defendants on the other hand and the amount in

18  controversy exceeds the sum of $75,000.

19     3.  Venue is proper in this district under 28 U.S.C. §§1391 and

20  1400(a) in that the majority of the plaintiffs reside in the Southern

21  District of California, or the principal place of business of

22  plaintiffs is in the Southern District of California and a substantial

23  part of the events giving rise to the claims specified in this

24  complaint occurred in the Southern District of California.

25  Furthermore, a related case is presently pending in the Southern

26  District of California entitled <u>Cyberoffice Technologies, L.L.C. v.</u>

27  <u>Software Solutions, Inc., et. al.</u>, Case No: 97-cv-1431-K.

28  <center>3</center>

1

## THE PARTIES

2      4.   Plaintiff Cyberoffice Technologies, L.L.C. is a Delaware
3   Limited Liability Company with its principal place of business in the
4   State of California.  Plaintiff Cyberoffice is the assignee of certain
5   exclusive dealerships sold by defendants Peter Lavergne and/or
6   Technical Support Group, Inc., Software Solutions, Inc., Peter
7   Lavergne DBA Software Solutions, Inc., Shawn Corriveau (herinafter
8   "defendants") to Tim Wright, The Support Centre, Lionel Berthiaume,
9   Richard Berthiaume, The Software Place, Inc., C.J. Channing, Computer
10  Support Services, Judy Thornell, Baytek, Marsha Roudabush, MicroTech
11  Software  Support  &  Training,  Inc.,  Kim  Clement,  Accounting
12  Conversions, Timy Tancey, Tancey & Associates, Larry Rizo, Algorithms,
13  Inc., Eli Yaron, Data Flow Information Systems, John Ristaino, Excel
14  Business Strategies, Bill McGuire, WJM Computer Sales, Jeff Craig,
15  Craig's Video, Tom Macauley, SKS Consulting Inc., Bette Harbin, CSI,
16  R.J. Gosselin, Computer Source 1, Gary Ketchum, Custom Computer
17  Solutions, Inc., Mike Canfield, CPA, Damon L. Walker, New South
18  Solutions, Chris Bellacose, Interactive Information Services, Joel
19  Stern, Unique Services, Inc., Michael Carroll, Power Tools for
20  Business, L.L.C., Jennifer Obrien, and JCS Computer Resource Corp. As
21  assignee of these exclusive dealerships, Cyberoffice brings this
22  complaint on the basis that defendants are now  claiming that the
23  Option Purchase Agreement entered into between Leonardo Orozco and
24  Peter Lavergne is not valid and that defendants did not previously
25  terminate these exclusive dealerships.  In the related action, it is
26  Cyberoffice's contention that the Option Purchase Agreement was
27  exercised  and  that  defendants  represented  that  the  exclusive

28                                4

1 dealerships had previously been terminated. It is Cyberoffice's

2 further contention that it is the sole and exclusive owner of all

3 rights, title and interest in the accounting software known as

4 "Solutions Accounting" ("The Software"). However, in the event that

5 said dealerships were not terminated, and that Cyberoffice is not the

6 copyright holder of The Software as defendants claim, Cyberoffice

7 herein brings this action for any and all claims arising between the

8 time the exclusive dealerships were assigned to Cyberoffice and the

9 present.

10     5. Plaintiff Tim Wright is an individual residing in the County

11 of Orange, State of California.

12     6. Plaintiff The Support Centre is a partnership with its

13 principal place of business in the State of California.

14     7. Plaintiff Lionel Berthiaume is an individual residing in the

15 County of Worchester, State of Massachusetts.

16     8. Plaintiff Richard Berthiaume is an individual residing in

17 the County of Worchester, State of Massachusetts.

18     9. Plaintiff The Software Place, Inc. is a Massachusetts

19 corporation, with its principal place of business in the State of

20 Massachusetts.

21     10. Plaintiff C.J. Channing is an individual residing in the

22 County of Ventura, State of California.

23     11. Plaintiff Computer Support Services is a DBA, with its

24 principal place of business in the State of California.

25     12. Plaintiff Judy Thornell is an individual residing in Clark

26 County, State of Nevada.

27     13. Plaintiff Baytek is a sole proprietorship, with its

28                       5

1 principal place of business in the State of California.

2     14.  Plaintiff Marsha Roudabush is an individual residing in
3 Hamilton County, State of Ohio.

4     15.  Plaintiff MicroTech Software Support & Training Center,
5 Inc., is an Ohio corporation, with its principal place of business in
6 the State of Ohio.

7     16.  Plaintiff Kim Clement is an individual residing in the
8 County of San Diego, State of California.

9     17.  Plaintiff Accounting Conversions is a sole proprietorship,
10 with its principal place of business in the State of California.

11     18.  Plaintiffs are informed and believe and based thereon allege
12 that defendant Software Solutions, Inc. ("SSI") is a business entity,
13 form unknown, with its principal place of business in the State of
14 Virginia, and doing business in the Southern District of California.

15     19.  Plaintiffs are informed and believe and based thereon allege
16 that defendant Peter Lavergne ("Lavergne") is an individual residing
17 in the State of Virginia, and doing business under the name of, among
18 others, Software Solutions, Inc. ("SS") in the Southern District of
19 California.

20     20.  Plaintiffs are informed and believe and based thereon allege
21 that defendant Shawn Corriveau ("Corriveau") is an individual residing
22 in the State of Virginia, and doing business in the Southern District
23 of California.

24     21.  Plaintiffs are informed and believe and based thereon allege
25 that defendant Technical Support Group, Inc. ("TSG") is a Virginia
26 corporation with its principal place of business in the State of
27 Virginia, and doing business in the Southern District of California.

28

6

1    22.  Plaintiffs are informed and believe and based thereon allege

2  that each of the defendants is the agent, co-conspirator and/or

3  nominee of the other defendants, and that in doing the wrongful acts

4  alleged herein each and every defendant was acting within the course

5  and scope of such agency and was acting with the consent, permission

6  and authorization of each of the remaining defendants. All actions of

7  each defendant were ratified and approved by every other defendant or

8  their officers, partners or managing agents.

9    23.  Plaintiffs are informed and believe and thereon allege that

10  defendants Lavergne and Corriveau are officers and co-owners of

11  defendants SSI, SS and TSG and the only two persons interested in the

12  corporations. Plaintiffs are further informed and believe and thereon

13  allege that defendants Lavergne and Corriveau actively participated

14  in the wrongs alleged herein, that they dominated, controlled and

15  influenced defendants SSI, SS and TSG to such an extent that SSI, SS

16  and TSG were and are mere instrumentalities of Lavergne and Corriveau

17  such that the individuality or separateness of SSI, SS and TSG has

18  ceased, that adherence to the fiction of the separate existence of

19  these corporations would, under the circumstances of this case,

20  promote an injustice, that SSI, SS and TSG are undercapitalized and

21  prospectively insolvent, that no stock has ever been issued, nor any

22  by-laws adopted for SSI, SS or TSG, and that the ends of justice

23  require that Lavergne and Corriveau be deemed to be SSI, SS and TSG's

24  alter ego.

25    24.  Plaintiffs are informed and believe and based thereon allege

26  that defendant Corriveau is the "straw man" and nominee of defendant

27  Lavergne and that Lavergne seeks to hide his wrongful conduct as

28                              7

1 | hereafter described by utilizing Corriveau's identity.

2 | FACTS COMMON TO ALL CAUSES OF ACTION

3 | 25. Cyberoffice is the assignee of certain exclusive dealerships
4 | assigned to it by certain dealers of the computer software product
5 | known as Solutions Accounting (the "Software"). Each of these dealers
6 | entered into an exclusive and/or non- exclusive written dealer
7 | agreement (the "Dealer Agreement") with TSG and/or Lavergne whereby
8 | each dealer was given an exclusive right to market and sell the
9 | Software within that dealer's territory. A form of a exclusive
10 | written Dealer Agreement is attached hereto as Exhibit "A."

11 | 26. In entering into the Dealer Agreement and paying valuable
12 | consideration therefore, each dealer relied upon the following
13 | representations of the defendants Lavergne, Corriveau, SS and TSG, and
14 | each of them:

15 | A. That all the features of the Software were fully
16 | operational and that the Software was merchantable and
17 | fit for its intended purpose as an accounting software
18 | program.

19 | B. That the defendants would provide the proper and
20 | efficient operational and technical support to the
21 | dealers for any problems arising from use of the
22 | Software by customers.

23 | C. That all sales leads received by the defendants from
24 | potential customers within a dealer's territory would
25 | be forwarded to the dealer for that territory.

26 | D. That if defendants conducted their own marketing
27 | programs resulting in customers placing orders

28 | 8

for the Software directly with the defendants, the defendants would immediately forward full and complete details of those sales to the dealer for that territory, along with a commission for those sales.

E.   That the defendants would not make any direct sale of the Software to an end user in a dealer's territory that would result in the use of the Software in that dealer's territory without paying a Gross Profit Percentage to the dealer as specified in the Dealer Agreement.

F.   That the defendants would not enter into a Dealer Agreement with any third parties for territory that was already within the exclusive territory of a particular dealer.

G.   That defendants would pay those dealers who entered into a Dealer Agreement, a commission for sales of the Software made by other dealers within the dealer's territory.

H.   That defendants would reimburse the dealers for any monies they had to pay out to customers who had purchased the Software, were unsatisfied, and wanted their money back.

27.   The representations of the defendants, and each of them, were in fact false.  The true facts, which defendants, and each of the, knew at the time they made such representations, were as follows:

A.   The Software did not work.  It contained multiple

9

defects, deficiencies, bugs and other problems which made it not fully operational and for all intents and purposes virtually unusable and worthless.

B.  Defendants did not provide adequate operational and technical support to the dealers.  When complaints about the Software were communicated to the defendants, the defendants would ignore them or refuse to remedy the problems.  The dealers were left with no one to turn to when the dealers received massive complaints from customers about the Software.

C.  The defendants did not pay commissions to the dealers for sales of the Software made by other dealers in that dealer's territory.

D.  The defendants themselves sold the Software to customers within the exclusive territory of the dealers without paying, and without intending to Pay, the dealers royalties/commissions for these sales.

E.  The defendants actively hid from the dealers the fact that the defendants were selling the Software to customers within the dealers' exclusive territories.

F.  The defendants entered into more than one Dealer Agreement with individuals for territory within the same exclusive territory previously sold to other dealers.

G.  The defendants refused to reimburse the dealers for

10

monies the dealers paid out to customers for reimbursements. Customers demanded reimbursement for the Software they had purchased after they learned the Software was virtually useless.

28. Despite demands by the dealers to the defendants for a saleable product and for defendants to cease and desist from selling and reselling Dealer Agreements to individuals for territory within the same exclusive territory previously sold to other dealers, as well as to cease and desist from selling the Software to customers within the exclusive territory of the dealers, the defendants continue to do so. The natural, probable and foreseeable result of the aforesaid conduct of the defendants is that the dealers have been, and will continue to be, deprived of business and goodwill, injured with respect to their goodwill and relations with prospective customers, and forced to pay out substantial amounts to counteract such conduct.

29. Plaintiffs are informed and believe and based thereon allege that unless enjoined by this Court, defendants intend to continue their course of conduct. As a direct and proximate result of the acts of the defendants alleged above, the dealers have already suffered irreparable damage and have sustained lost profits. The dealers have no adequate remedy at law to redress all of the injuries the defendants have caused and intend to cause by their conduct. The dealers will continue to suffer irreparable damage and to sustain lost profits until the defendants' actions alleged above are enjoined by this Court.

11

### FIRST CLAIM FOR RELIEF
#### Breach of Contract
(By all Plaintiffs against all Defendants)

30.   Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 29, inclusive, and incorporate them herein by this reference.

31.   Defendants, and each of them, have breached the Dealer Agreements, inter alia, as follows:

A.   By failing to provide a software product that was of marketable standards so that it could be sold by the dealers to customer users.

B.   By failing to provide proper and efficient operational support to the dealers for problems arising from use of the Software by customers of the dealers.

C.   By failing to honor the exclusive territory of the dealers by entering into Dealer Agreements with other dealers for all or parts of the territory which were previously given to other dealers.

D.   By selling the Software themselves into the exclusive territory of the dealers.

32.   The dealers have performed all of the conditions, covenants and obligations under the Dealer Agreement on their part to be performed except for those provisions they were excused from performing by reason of the acts and/or statements of the defendants.

33.   By reason of the foregoing, defendants, and each of them, have breached the Dealer Agreements.

34.   As a direct and legal result of the aforesaid breaches, the dealers have suffered substantial damages, the total amount of such

1  damages cannot be ascertained at this time, but which is in excess of

2  $75,000.

3  ## SECOND CLAIM FOR RELIEF
### Fraud

4  **(By all Plaintiffs, except Cyberoffice, against all Defendants)**

5      35.  Plaintiffs reallege each and every allegation set forth in

6  paragraphs 1 through 34, inclusive, and incorporate them herein by

7  this reference.

8      36.  The misrepresentations specified in paragraph 26 of this

9  complaint were made by defendants to the dealers in an effort to lure

10  the  dealers  into  (1)  entering  into  a  Dealer  Agreement,  (2)

11  establishing business relationships for the benefit of defendants, (3)

12  purchasing inventories of the Software from defendants, (4) developing

13  a customer base, and (5) paying valuable consideration to defendants.

14  Such representations were made to the dealers prior to the time each

15  particular dealer entered into a Dealer Agreement.

16      37.  In reasonable reliance upon these misrepresentations, the

17  dealers (1) entered into a Dealer Agreement, (2) established business

18  relationships for the benefit of defendants, (3) purchased inventories

19  of the Software from defendants, (4) developed a customer base, and

20  (5) paid valuable consideration to defendants.  Some of the dealers

21  utilized their previously established customer base.   The dealers

22  expended valuable consideration in these endeavors.

23      38.  At the time defendants made these representations they were

24  false  and  defendants  knew  them  to  be  false  and  intentionally

25  misrepresented the true facts in order to induce the dealers to do the

26  aforementioned acts, as well as other actions described hereinabove.

27      39.  The dealers justifiably relied upon the representations of

28                                  13

1   defendants when the dealers engaged in the aforementioned acts, as
2   well as took other actions described hereinabove.

3        40.   As a direct and legal cause result of the aforesaid
4   fraudulent representations, the dealers have been substantially
5   damaged in an amount of which cannot yet be ascertained. The
6   monies invested have been lost, refunds have had to be made to the
7   customers and the reputation and goodwill of the dealers with the
8   newly established and previously existing customer base has been
9   severely damaged all according to proof at trial.

10       41.   The conduct of defendants was and is fraudulent, oppressive,
11  malicious, and in conscious disregard of the rights of the dealers,
12  and, therefore, the dealers are entitled to punitive damages against
13  each such defendant.

14                      **THIRD CLAIM FOR RELIEF**
                        **Unfair Business Practices**
15      **California Business & Professions Code, §§ 17200 et. seq.**
                    **(By all Plaintiffs against all Defendants)**
16

17       42.   Plaintiffs reallege each and every allegation set forth in
18  paragraphs 1 through 41, inclusive, and incorporate them herein by
19  this reference.

20       43.   The defendants' aforesaid conduct constitutes unfair,
21  unlawful, and fraudulent business practices in violation of California
22  Business and Professions Code §§ 17200 et. seq.

23       44.   These wrongful acts have proximately caused and will
24  continue to cause the dealers substantial injury, including loss of
25  customers, dilution of its goodwill, confusion of potential customers,
26  and injury to their reputation. These actions will cause imminent
27  irreparable harm and injury to the dealers, the amount of which will

28                                 14

1  be difficult to ascertain, if they continue. Therefore, the dealers
2  are without an adequate remedy at law.

3      45.   Plaintiffs are entitled to an injunction restraining the
4  defendants, their officers, agents, employees, and all persons acting
5  in concert with them from engaging in further such unlawful conduct.

6      46.   Plaintiffs are entitled to recover from defendants the
7  damages sustained by the dealers as a result of defendants' wrongful
8  acts as hereinabove alleged. The amount of such damages cannot be
9  determined at this time. Plaintiffs are further entitled to recover
10  from defendants the gains, profits, and advantages they have obtained
11  as a result of their wrongful acts as hereinabove alleged. Plaintiffs
12  are at present unable to ascertain the full extent of these gains,
13  profits, and advantages, but are informed and believe and based
14  thereon allege that the amount is in excess of $75,000.

15      47.   The conduct of defendants was and is fraudulent, oppressive,
16  malicious, and in conscious disregard of the rights of the dealers,
17  and, therefore, they are entitled to punitive damages against each
18  such defendant.

19                      **FOURTH CAUSE OF ACTION**
                        Negligent Misrepresentation
20      **(By all Plaintiffs, except Cyberoffice, against all Defendants)**

21      48.   Plaintiffs reallege each and every allegation set forth in
22  paragraphs 1 through 47, inclusive, and incorporate them herein by
23  this reference.

24      49.   In making the representations specified in paragraph 26 of
25  this complaint, the defendants had no reasonable basis for believing
26  the truth of such representations and knew, or should have known, that
27  the representations were false.  Among other things, the defendants

28                                15

1  knew or should have known that the Software was so full of bugs and
2  defects that it was unworkable.     50.   By making such representations
3  with no reasonable basis   of believing the truth thereof, the
4  defendants breached their duty to the dealers to disclose the true
5  facts regarding the usefulness of the Software and lack of exclusivity
6  in the sales territory.

7      51.  The dealers were unaware of the falsity of the defendants'
8  misrepresentations and their failure to disclose the true facts as set
9  forth above.  The dealers justifiably relied upon such representations
10 to their detriment by engaging in the aforementioned acts, including
11 entering into a Dealer Agreement and purchasing inventories of the
12 Software.

13     52.  As a direct and legal cause of the aforesaid negligent
14 misrepresentations, the dealers have suffered damages in an amount
15 according to proof at the time of trial.

16                    **FIFTH CAUSE OF ACTION**
                          Accounting
17            (By all Plaintiffs against all Defendants)

18     53.  Plaintiffs reallege each and every allegation set forth in
19 paragraphs 1 through 52, inclusive, and incorporate them herein by
20 this reference.

21     54.   The Dealer Agreement required, among other things,
22 defendants to expend funds paid by the dealers to establish and
23 operate a service center to properly and efficiently handle customer
24 service needs regarding the Software and to insure the Software's
25 quality.

26     55.  Pursuant to such agreement, as well as the aforementioned
27 representations of the defendants, and in reliance thereof, the

28                              16

1  dealers paid substantial sums to defendants for the purpose of
2  establishing and maintaining a customer support center.

3      56.   Notwithstanding the payment of such sums, no adequate
4  customer support center or any other type of operations support has
5  been provided for the dealers.

6      57.   The dealers are entitled to an accounting of the use of the
7  proceeds used to establish and maintain the customer support center
8  or used to provide any operational support for the Software.

9      58.   The dealers are entitled to an Accounting for all sales of
10 the Software that defendants have made in the dealers' territories to
11 date.

12                    **SIXTH CAUSE OF ACTION**
                         Conspiracy
13            **(By all Plaintiffs against all Defendants)**

14     59.   Plaintiffs reallege each and every allegation set forth in
15 paragraphs 1 through 58, inclusive, and incorporate them herein by
16 this reference.

17     60.   Plaintiffs are informed and believe and based thereon allege
18 that in and around October of 1996, defendants Lavergne, Corriveau,
19 SSI, SS and TSG formed a conspiracy to infringe on the dealers
20 valuable licensing rights as well as to cause the dealers to pay
21 valuable consideration for defective and useless Software.

22     61.   In joining, and in the furthering of, the conspiracy each
23 defendant knew of each and every Dealer Agreement entered into by the
24 dealers, knew of each dealer's exclusive territory, and, in spite of
25 such knowledge, committed the wrongful acts as specified herein.  Such
26 actions by each co-conspirator was with the intent to further the
27 conspiracy in an effort to deprive the dealers of profits, revenue and

28                                17

1  goodwill, to misappropriate substantial sums from the dealers for the
2  payment of the dealers' interest, and to extract substantial sums from
3  the dealers for inventories of virtually useless and defective
4  Software.

5      62.  As a proximate result of defendants' conspiracy to defraud
6  as alleged above, the dealers have sustained damages, the total amount
7  of which cannot be ascertained at this time.

8      63.  Defendants' conduct described herein was done with conscious
9  disregard of the dealers and their rights with the intent to vex,
10 injure or annoy such as to constitute oppression, fraud or malice
11 entitling plaintiffs to an award of punitive or exemplary damages in
12 an amount appropriate to punish or set an example of defendants, and
13 each of them.

14 **SEVENTH CAUSE OF ACTION**
   **Breach of Covenant of Good Faith and Fair Dealing**
15 **(By all Plaintiffs against all Defendants)**

16     64.  Plaintiffs reallege each and every allegation set forth in
17 paragraphs 1 through 63, inclusive, and incorporate them herein by
18 this reference.

19     65.  In entering into the Dealer Agreement, the dealers reposed
20 trust and confidence in the defendants, and each of them,  to deal
21 fairly with them and to not wrongfully breach the written and implied
22 oral promises and Dealer Agreement.

23     66.  In addition to the express terms of the Dealer Agreement,
24 defendants impliedly covenanted that it would deal fairly and in good
25 faith and would not arbitrarily, capriciously, or without good cause
26 deprive the dealers of the benefit of their bargain with them and not
27 otherwise engage in unlawful conduct toward the dealers.

28                           18

67.   Defendants Lavergne and TSG, with the knowledge and consent of defendants SSI, SS and Corriveau, have breached the Dealer Agreement by virtue of their breaches of the implied covenants of good faith and fair dealing and by failing to deal honestly, fairly and in good faith with the dealers in each of the particulars set forth hereinabove.

68.   The dealers have performed all of the conditions, covenants and obligations under the Dealer Agreement on their part to be performed, except for those provisions they were excused from performing by reason of the acts and/or statements of the defendants.

69.   As a direct and legal cause of the aforesaid breaches of the implied covenant of good faith and fair dealing, the dealers have been substantially damaged the amount of which cannot yet be ascertained but which is in excess of $75,000.

### EIGHTH CAUSE OF ACTION
### Breach of Express Warranty
### (By all Plaintiffs against all Defendants)

70.   Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 69, inclusive, and incorporate them herein by this reference.

71.   On or about October of 1996, the dealers negotiated with defendants to sell the Software.  In the course of the negotiations, defendants orally promised that the Software (1) was a top-quality product, (2) was free from defect, and (3) was fully operational. Furthermore, when the dealers browsed defendants' Web page, which defendants told the dealers to browse before signing the Dealer Agreement, the Web page expressly warranted the Software to be a top-quality product.   Such promises became part of the basis of the

19

1  bargain between the parties and, thus, constituted an express
2  warranty.

3       72.  Defendants breached said express warranty in that the
4  Software (1) was of poor quality workmanship, (2) had numerous
5  defects, and (3) was not operational and virtually unusable.
6  As a result of these breaches, the dealers did not receive goods as
7  warranted by defendants.

8       73.  The dealers have notified defendants on numerous occasions
9  of such breach.

10      74.  As a direct and proximate result of such breach of warranty
11 by defendants, the dealers have been damaged in an amount to be proven
12 at trial.

13                          **NINTH CAUSE OF ACTION**
               **Breach of Implied Warranties of Fitness and Merchantability**
14                     **(By all Plaintiffs against all Defendants)**

15      75.  Plaintiffs reallege each and every allegation set forth in
16 paragraphs 1 through 74, inclusive, and incorporate them herein by
17 this reference.

18      76.  In selling the Software to the dealers and entering into the
19 Dealer Agreement, defendants implicitly warranted that the Software
20 would be fit for its intended purpose and would be merchantable.  In
21 reality, the Software was so defective and full of bugs that it was
22 virtually useless.

23      77.  By reason of the foregoing, defendants breached the implied
24 warranties of fitness for a particular purpose and of merchantability
25 in that the Software was not fit for the ordinary purpose for which
26 such goods are used in that the Software contained multiple defects,
27 deficiencies, bugs and other problems which made it not fully

28                               20

1 operational and for all intents and purposes unusable.

2     78.   As a proximate result of such breach, the dealers have been

3 damaged in an amount according to proof at trial.

4 <u>**TENTH CAUSE OF ACTION**</u>
**False, Misleading or Deceptive Advertising**
5 **California Business & Professions Code § 17500**
**(By all Plaintiffs against all Cross-Defendants)**
6

7     79.   Plaintiffs reallege each and every allegation set forth in

8 paragraphs 1 through 78, inclusive, and incorporate them herein by

9 this reference.

10     80.   From at least October of 1996, defendants, and each of them,

11 with the intent to induce members of the public to purchase and sell

12 the Software, have made untrue and misleading statements on

13 defendants' Web page which they knew, or by the exercise of reasonable

14 care should have known, to be untrue or misleading at the time the

15 statements were made.   These misrepresentations, which violate

16 Business and Professions Code § 17500, include, but are not limited

17 to, the following (1) the Software is a top-quality product, (2) the

18 Software is free from material defect, (3) the Software is fully

19 operational and (4) the copyright to the Software is owned by

20 defendants and defendants hold the exclusive rights and privileges in

21 and to the copyright of the Software.

22     81.   The representations made by defendants, and each of them,

23 as set forth above were untrue or misleading when made, and were

24 known, or by the exercise of reasonable care should have been known,

25 by defendants to be untrue or misleading.

26     82.   Unless enjoined by order of the Court, defendants will

27 continue to make untrue or misleading statements and will continue to

28                            21

1  mislead potential and actual purchasers of their products.

2  **ELEVENTH CAUSE OF ACTION**
**Negligence Per Se**
3  **(By all Plaintiffs against all Cross-Defendants)**

4  83.   Plaintiffs reallege each and every allegation set forth in
5  paragraphs 1 through 82, inclusive, and incorporate them herein by
6  this reference.

7  84.   The aforementioned conduct of Defendants, and each of them,
8  constitutes unfair, unlawful, and fraudulent business practices and
9  is in violation of California Business and Professions Code §§ 17200
10  et seq.

11  85.   The dealers' injuries are of the type that California
12  Business and Professions Code §§ 17200 et seq. is intended to prevent.
13  The dealers are within the class of persons for whose protection
14  California Business and Professions Code §§ 17200 et seq. was adopted.

15  86.   Defendants violation of the prohibitions against unfair,
16  unlawful, and fraudulent business practices constitutes negligence per
17  Se and created, under California Evidence Code  §669, a presumption
18  of negligence.   Said negligence proximately caused injuries to the
19  dealers as alleged herein, including economic loss in an amount of
20  which cannot yet be ascertained but in excess of $75,000.

21  **PRAYER FOR RELIEF**

22  Wherefore, plaintiffs pray for judgment and relief on all Causes
23  of Action as follows as is appropriate for each particular cause of
24  action:

25  1.   That defendants, their agents, servants, officers, employees
26  and all those acting in concert with them be enjoined during the
27  pendency of this action and permanently from selling, marketing, or

28  22

1  distributing the Software into a dealer's exclusive territory.

2      2.  That defendants, their agents, servants, officers, employees

3  and all those acting in concert with them be enjoined during the

4  pendency of this action and permanently from entering into any Dealer

5  Agreement which gives a person rights to sell the Software in an area

6  within the exclusive territory of an existing dealer.

7      3.  That judgment be entered for plaintiffs and against the

8  defendants for the total amount of the dealers' damages according to

9  proof at trial.

10      4.  That the plaintiffs be awarded punitive and exemplary

11  damages against the defendants.

12      5.  That the plaintiffs have judgment against defendants for its

13  costs and attorneys' fees.

14      6.  That the Court grant an order requiring defendants, their

15  agents, servants, officers, employees and all those acting in concert

16  with them to undergo an Accounting and disgorge any unjust enrichment

17  to plaintiffs.

18      7.  That the Court grant such other, further, and different

19  relief, equitable as well as legal, as the Court deems proper under

20  the circumstances.

21

22

23  Dated: April 13, 1998          WELLMAN & WARREN LLP

24

25                         By: _____

26                           Shannon G. Mathew
                         Scott W. Wellman

27                           Attorneys for Plaintiff

28                  23

EXHIBIT "A"

Leo,

Here is the Elite agreement that most Elite Dealers are working under.  It pretty well spells out the distribution, support and training plan Peter and I put together last year.  Elite dealer marketing was to be supplemented by Solutions working out magazine/CD deals and developing national accounts.

## Elite Dealer Agreement

**The contents of this document are highly confidential and include business plan information that is secret. This document nor the information contained herein is to be disclosed to anyone other than the intended recipient. Any unauthorized disclosure will result in prosecution and civil actions allowed by law.**

This Agreement is entered into this _____ day of _____, 199____ between Technical Support Group, Inc. (OWNER) and _____, located at _____ (DEALER). This Agreement is entered into based upon the following terms and conditions:

WHEREAS OWNER holds all rights, title and interest to the software packages known as "Solutions Accounting Products"; and

WHEREAS, DEALER desires to undertake marketing efforts to sell Solutions Accounting Products; and

WHEREAS, OWNER and DEALER have determined that it is in their mutual best interests to engage in a relationship to allow DEALER to market, sell and support Solutions Accounting Products,

NOW THEREFORE, based upon the mutual covenants and conditions contained herein and the promises set forth, the parties hereto agree as follows:

1.0 By execution of this Agreement, Technical Support Group hereby confers upon DEALER the exclusive right to sell and support Solutions Accounting Products and other accounting or accounting related products (hereinafter referred to as PRODUCT) developed by OWNER in the future, excluding custom programs developed for a specific client for the sole and only use by said specific client and unrelated to Solutions Accounting Products, under the following terms      and conditions:  (The OWNER is entering an agreement with a third party for the development of a SQL - Client/Server product that will interface with Solutions Accounting). All products marketed or offered for sale by OWNER, including said SQL Client/Server product will be through Elite Dealer under terms and conditions contained here in.

1.1 DEALER is hereby granted the exclusive right to sell any and all PRODUCT defined herein in a territory defined as that physical area encompassed by telephone area codes _____. If any other area code is created within this territory, the newly created territory shall be the exclusive territory of DEALER. If a new area code is created that encompasses a territory that is the exclusive territory of DEALER and a territory that is the exclusive territory of another Elite Dealer then OWNER has the sole and exclusive right to assign said new territory to the Elite Dealer of OWNER's choice based upon any criterion or basis OWNER so determines, whether

1

reasonable or unreasonable.

1.2 If any sales leads from potential customers in DEALER's territory are received by Owner, then said sales lead will be forwarded to Dealer. If OWNER develops a marketing and sales plan whereby major retail chains (ie. Egghead, CompUSA, etc.) distribute demo product resulting in sales leads, then DEALER must have previously established at least ten dealers (Resellers, Stocking Dealers and/or Professional Dealers) to receive such leads. This is the only instance whereby OWNER may make direct end user sales. Said sales must be at a suggested manufacture's retail price.

1.3 Owner intends to conduct it's own marketing programs that may result in customers placing orders directly with OWNER. OWNER will immediately forward to DEALER full and complete details of the sale including customer name, address, phone, contact and PRODUCT purchased. With respect to direct sales by OWNER, OWNER, shall remit to DEALER a payment equal to direct sales in DEALER's territory multiplied by DEALER's then Gross Profit Percentage (defined hereinbelow) less any commission payments made to unrelated parties required as result of that particular marketing program. In no event shall such payment be less than an amount equal to the OWNER's suggested retail price (see Appendix A for current pricing) multiplied by one-half DEALER's Gross Profit Percentage unless otherwise agreed to in writing. Said payment to be made by the 20th of the month following receipt of payment from customer. OWNER reserves the right to reduce said payment by any amounts owed by DEALER to OWNER.

1.4 It is expected that another Elite Dealer may negotiate a sale of PRODUCT to an entity that has an office or locations in DEALER's territory where at PRODUCT will be installed. In such instances OWNER will remit to DEALER an amount equal to 25% of the sales price of PRODUCT, exclusive of any custom modification charges, by the 20th of the month following receipt of payment from the selling Elite Dealer.

1.5 OWNER cannot make any direct sale to an end user in DEALER's territory, or, complete a sale that will result in the use of PRODUCT in DEALER's territory without paying the appropriate Gross Profit Percentage to DEALER under the terms and conditions above.

1.6 OWNER will provide DEALER two days of PRODUCT training, and supplemental training if reasonable, at OWNER's facilities. OWNER reserves the right to access reasonable charges for said training. DEALER will be notified of such charges 30 days prior to implementation.

1.7 OWNER will provide DEALER an Instructor's Training Manual for purposes of holding training classes for PRODUCT. OWNER must utilize said Trainer's manual in all classes to assure proper coverage of subject matter.

1.8 OWNER will develop and maintain an end-user training manual which must be utilized by DEALER in any training classes for PRODUCT. DEALER is encouraged and requested to provide suggestions for improvement of the end user training manual. Current pricing for said manuals is $30 each. At least one manual must be purchased for each company attending the training class. Duplication of manuals without the express written consent of OWNER is forbidden. **Breech of this clause results in the immediate termination of this agreement and cancels any and all obligations , known or unknown, financial or non-financial,  of OWNER to DEALER .**

1.9 OWNER will provide to DEALER, when available, a complete Technical Support Data Base (TSDB) to assist Dealer in providing end user support. Said TSDB will contain all known program bugs and the expected correction release dates; system (operating system and program) error messages and suggested means to correct said errors; Frequently Asked Questions (FAQ's) including FAX Back documents; planned product improvements; and other information deemed useful for support and sale of PRODUCT. It is DEALER's responsibility and obligation to contribute to the TSDB in order to assure the highest level of customer support and service.

2

1.10 OWNER will provide technical support to Elite Dealers only, except in those instances wherein OWNER determines that the end users best interest would be served by OWNER providing direct support. In such event OWNER will report to DEALER the results of the technical assistance provided. OWNER reserves the right to charge for direct support to end users. In the case of National accounts (companies with multiple locations through out the United States and/or abroad), it is understood by DEALER that OWNER may be required to provide direct support to said end user pursuant to terms of contract. Additionally, in those cases where a customer refuses to use technical support or training services provided by their local Elite Dealer, OWNER reserves the right to provide such services or to refer the customer to another Elite Dealer.

1.11 OWNER will establish conditions and requirements for an individual to become either a Solutions Certified Trainer (SCT) or a Certified Elite Support Analyst (CESA). All Elite Dealers must have on staff or under contract at least one CESA residing within DEALER's territory. End user installation and training must be accomplished by either a SCT or A CESA. End user phone support or on-site technical support must be provided by a CESA. SCT's are allowed to only provide installation, setup, bookkeeping and accounting services to Solutions Accounting customers; all technical support problems (error messages, inability to access features or functions, corrupted data or programs, operating environment conflicts and settings, or other problems not involving how to use the PRODUCTS) must be provided by a CESA.

1.12 OWNER will create a Technical Support Service Tracking and Billing system within Elite accounting for utilization by DEALER. Said program will be provided at no cost to DEALER.

1.13 OWNER will provide certification testing of vertical market add-on's to PRODUCT.

1.14 OWNER may establish reasonable conditions and requirements necessary to insure the highest level of customer support and the successful marketing of PRODUCT.

1.15 For valuable services provided, OWNER does hereby agree to pay The Support Centre a royalty of 15% of all purchases of PRODUCT made by Elite Dealers brought into this program by The Support Centre. Additionally The Support Centre is to be paid a 4.5% royalty on sales of third party developer's add-on products offered for sale through OWNER. Said payments to be made the 20th of the month following receipt of payment from said Elite Dealers.

1.16 OWNER is hereby granted a first right of refusal by DEALER to purchase any Territory offered for sale by DEALER, or, to purchase a Territory whose effective control and ownership would be transferred to another party via sale of stock or voting rights of DEALER or a Subsidiary or other entity owned or controlled by DEALER.

1.17 DEALER is hereby granted a first right of refusal to acquire any adjacent Territory not previously assigned to another Elite dealer. In the event there is another Elite Dealer that is also adjacent to such unassigned Territory, Owner shall determine which DEALER has the right of first refusal, and, who has the second right of refusal.

2.0 By executing of this Agreement, DEALER also agrees to the following requirements, terms and conditions:

2.1 To contact, in person if necessary, each and every independent PC dealer (this does not include major retail chains such as CompUSA, Fry's, Computer City etc.) in DEALER's Territory for the purpose of establishing said independent PC store as either a Reseller (a non-stocking entity that purchases PRODUCT at 85% of suggested retail price of PRODUCT) or as a Stocking Dealer (a dealer that maintains a minimum number of saleable PRODUCT in it's store(s) and purchases said stock from DEALER at suggest price of 75% of suggested retail price.). DEALER is responsible for and must actively be engaged in the establishment and maintenance of Resellers and Stocking

3

Dealers in their Territory.

2.2 To provide each and every CPA or bookkeeping business in public practice in DEALER's area a Solutions CD for the purpose of establishing said professional as a referring professional or as a Profession Dealer (an entity that is a Reseller with a SCT employed on staff).

2.3 To provide semi-monthly reports of all contacts made pursuant to paragraphs 2.1 and 2.2 to OWNER.

2.4 To provide sales, training and technical support to Resellers, Stocking Dealers, Professional Dealers and end users in DEALER'S Territory in a timely and professional manner.

2.5 To provide training classes for Resellers, Dealers, Professional Dealers and end users within a reasonable distance of the Territory said entities reside. Said courses must be taught using the Trainer's manual and end user training manuals supplied by OWNER. All classes must be taught by a CESA.

2.6 To pay for all product purchased from OWNER at the time of order placement or at delivery.

2.7 To either retain on staff or establish relationships with local professionals in the accounting, network or other PC related fields to assist DEALER in providing the highest levels of customer support and service.

2.8 All CESA's employed or contracted with by DEALER must pass an annual re-certification test administered by OWNER. From time to time as deemed necessary by OWNER, SCT's may be required to either pass a test or attend a training seminar.

2.9 To be actively engaged in continuing improvement of the TSDB, Trainer's manual and end user training manuals.

2.10 To pre-arrange customer support coverage by another Elite Dealer or OWNER in those instances where, due to absence, vacation or other cause, DEALER's CESA(s) would not be available to provide such phone services during normal business hours.

2.11 To retain adequate staffing to meet customer support needs in DEALER's Territories.

2.12 To return all customer support calls within six business hours. This is a maximum and should not be considered an average call back time frame. It is expected that normal call return will be within one hour excepting those periods where higher than normal volume is to be expected. DEALER is encouraged to select a Professional Dealer to train as a CESA to provide support during overload periods.

2.13 Any technical support issues not resolved within six hours must be reported to OWNER via phone or other prescribed means. OWNER will put forth it's best efforts to solve the problem immediately.

2.14 DEALER will not sell any third party add-on software to PRODUCT that has not been certified by OWNER.

2.15 DEALER will fully document and test any custom modification of PRODUCT developed for a customer prior to delivery to assure bug free operation. If a bug is subsequently discovered in the custom modification DEALER will immediately devote all necessary resources to correction of the bug. OWNER may, but is not required to, assist in correcting the bug. If OWNER determines that any programmer is not sufficiently competent to write modifications to PRODUCT, then OWNER has the right to declare said person non-qualified for PRODUCT purposes and said person may no longer write PROGRAM modifications on DEALERS behalf until OWNER is satisfied that said

4

programmer has gained sufficient competence.

2.16 DEALER will pay to OWNER a quarterly maintenance fee of not less that S50 nor more than S75 for each client that DEALER has entered into an annual support and maintenance agreement with for PRODUCT; a fee of no less that S10 nor more than S25 for any support contract covering a period of less than one year; and a fee of S1 for each pay-per-call support service provided. DEALER is required to submit a monthly report reflecting all new support contracts issued since the preceding month and the total number of pay-per-call support services provided. Said report is due by the 20th of the following month sale or service along with any amounts due OWNER pursuant to this clause.

2.17 a) DEALER hereby agrees to pay OWNER 20% of any profit derived from the sale of a Territory assigned to DEALER. or, if any Territory whose effective control and ownership would be transferred to another party via sale of stock or voting rights of DEALER or a Subsidiary or other entity owned or controlled by DEALER then DEALER will pay to OWNER 20% of the price paid. DEALER is required to notify OWNER of intent to sell or transfer a territory as soon possible after said decision is made, and, to notify within three working days of an actual sale or transfer. Any amounts due under this clause must be remitted at the time of settlement or escrow or, within three working days or receipt of payment if no formal closing procedure is utilized. The full amount due OWNER must be paid by Cashier Check at the time of settlement or transfer unless otherwise agreed to in writing.

    b)  Paragraph 2.17 a) does not apply to a transfer to a trust for the benefit of a principal, owner or stockholder, or for the benefit of their immediate family; nor to a transfer as a result of Last Will and Testament to immediate family; nor to a transfer to immediate family as a result of intestate succession. This clause applies only to such persons who are principals, owners or stockholders as of the date of execution of this document. By acceptance of such a transfer, transferee agrees to abide by all terms, condition and requirements of this Agreement.

2.18 Upon acceptance of this agreement DEALER will pay a one-time fee of $5,000.00 to OWNER in consideration of the rights and considerations granted herein.

3.0 By executing this Agreement, Dealer agrees to enforce all licensing rights and obligations of Technical Support Group for Solutions Accounting Products. Specifically, Dealer acknowledges that Technical Support Group technical support services are not provided to any user without a software registration card on file with Technical Support Group. Dealer acknowledges and agrees that it will take all steps possible to assure that any purchaser of Solutions Accounting Products will execute and return the software registration card to Technical Support Group upon the purchaser's purchase of Solutions Accounting Products. In the event of any Change in Technical Support Group's support policy Technical Support Group shall provide 30 days advance written notice to Dealer.

4.0 OWNER's current price list for PRODUCT is attached hereto as Exhibit "B". OWNER reserves the right to modify its pricing policy at any time with 15 days advance notice to DEALER. DEALER's purchases from OWNER of PRODUCT will begin at a discount of 40% of suggested retail price (Gross Profit Percentage), and, based upon unit volume and sales dollars said discount would be increased to 50%. Said sales level to be determined and published by OWNER within thirty days. In the case of vertical market add-on's offered for sale through OWNER, DEALER's discount will be 35%, or, 60% of the gross profit from the sale (Suggested Retail Price less amounts required to be paid the developer), whichever is less.

5.0 DEALER may not disable the Technical Support Group forced registration system in any Solutions Accounting Product, nor may the DEALER remove any Technical Support Group, Inc. names or logos, nor may the DEALER modify any error messages without the express written consent of OWNER.

6.0 The term of this Agreement shall be for a period of 10 years. This agreement shall automatically renew at the end of each 10-year period unless terminated by mutual consent or canceled or terminated pursuant to terms and conditions herein. The renewal fee shall be $1.00.

5

7.0 DEALER shall use its reasonable best efforts to solicit sales of Solutions Accounting Products. During the term of this Agreement, DEALER shall have the right to promote, solicit orders for, sell and/or otherwise market Solutions Accounting Products freely, subject to the restrictions set forth herein. Any advertising or promotional material developed by DEALER referring to PRODUCT must be approved by OWNER prior to their use.

8.0 DEALER is not an employee of OWNER for any purpose whatsoever, but is an independent business properly licensed. All expenses and disbursements, including, but not limited to, those for travel and maintenance, entertainment, office, clerical and general selling expenses, that may be incurred by DEALER in connection with this Agreement, shall be borne wholly and completely by DEALER, and, OWNER shall not be in any way responsible or liable therefore.  DEALER does not have, nor shall it hold itself out as having, any right, power or authority to create any contract or obligation, either express or implied, on behalf of, in the name of, or binding upon OWNER, or to pledge OWNER's, or to extend credit in OWNER's name.

9.0 Each party shall save the other harmless from and against and shall indemnify the other for any liability, loss, costs, expenses, or damages, howsoever caused by reason of any injury (whether to body, property, or personal or business character or reputation) sustained by any person or to any person or to property by reason of any act, neglect, default or omission of it or any of its agents, employees or any other representatives and, in the case of OWNER in favor of DEALER, by any reason or on grounds of indemnification. If either party is sued in any court for damages for reason of any of the acts of the other party referred to in this paragraph, such other party shall defend such action (or cause same to be defended) at its own expense and shall pay and discharge any judgment that may be rendered in any such action; if such other party fails or neglects to so defend in said action, the party sued may defend the same and any expenses, including reasonable attorneys' fees, which it may pay or incur in defending said action and the amount of any judgment which it may be required to pay shall be promptly reimbursed upon demand; failure to do so immediately upon demand terminates this agreement (but not any financial or other obligation of DEALER to OWNER). Nothing herein is not intended to nor shall it relieve either party from liability for its own acts, omission or negligence.

10.0 DEALER further agrees, in the event of non-payment, to bear the cost of collection, and/or Court costs and legal fees should this be required.

11.0  OWNER may require at least one CESA or principal from DEALER's business to attend an annual conference/seminar.  If a mandatory conference is required by OWNER, failure to attend, at the sole discretion of OWNER, will result in the termination of this Agreement. OWNER may require all CESA's and/or SCT's to attend a technical update seminar in order to maintain their certification.

12.0 Either party shall have the right to terminate this Agreement upon the occurrence of any of the following events:

12.1 Breach or default by the other of any of the terms, obligations, covenants, representations or warranties under this Agreement, which is not waived in writing by the non-defaulting party.  In such case, the non-defaulting party shall notify the other of such alleged breach of default and the other party shall have a period of 15 days to cure the same.

12.2 The other party is declared insolvent or bankrupt, or makes an assignment for the benefit of creditors, or any proceeding is demanded by, for, or against the other under any provision of the Federal Bankruptcy Act or any amendment thereof.

12.3 If DEALER presents any check to OWNER for payment of goods purchased under this Agreement which is returned by DEALER'S bank more than once. OWNER shall have the sole and exclusive

6

right to suspend or cancel this Agreement.

12.4  Distributing unauthorized copies of Solutions Accounting Products, or selling any program that includes PRODUCT code under a different name without the express written consent of OWNER including the sale of the runtime version as stand alone product.

12.5  Failing to have a CESA on staff or under contract to provide support services within DEALER's Territory; said CESA must reside within DEALER's Territory(s).

12.6  Allowing a non-CESA to provide technical phone or on-site support without supervision by a CESA who shall be present with the non-qualified individual.

12.7  To allow a non-SCT to provide installation and training services without supervision by a CESA who must be present with the non-qualified individual.

12.8  Failure to adequately and reasonably promote Resellers, Stocking Dealers and Professional Dealers as described herein.

12.9  Failure to follow-up OWNER Provided SALES leads within 3 working days.

12.10  Failure to provide phone support in a timely manner.

12.11  Failure to correct defects in custom programming timely.

12.12  To make copies of Training Manuals without the express written consent of OWNER.

13.0  Promptly upon the expiration, termination or cancellation (for any reason) of this Agreement, DEALER shall immediately and forever thereafter cease to solicit sales or technical support of Solutions Accounting Products in any manner. Upon termination, DEALER shall return to or cause to be returned to OWNER, after receipt of written demand, and at Dealer's sole cost and expense, all advertising material, promotional materials and other materials not previously returned to OWNER; all documentation and source/object code for any custom modifications or add-on applications to PRODUCT developed by DEALER, the title to which shall immediately vest in OWNER; all advertising, marketing or other materials pertaining to PRODUCT; all removable media such as floppy disks magnetic tape, CD or other such media that contains PRODUCT or PRODUCT related items; and to remove all such materials from non-removable media under the control or direction of DEALER. All licenses to use of OWNER's PRODUCT are immediately terminated, revoked and canceled.

13.0  In the event of any conflict between the provisions of this Agreement and the provisions contained in any contract or sales order form used by OWNER, the provisions of this Agreement shall control.

14.0  Any disputes arising amongst the parties to this Agreement with regards to the terms or conditions of this Agreement shall be adjudicated in the State of Virginia, with the terms and provisions of Virginia law being utilized. If any provision, condition or requirement is held to be invalid all other provisions, requirements and conditions shall remain in force.

15.0  This Agreement constitutes the entire Agreement between OWNER and DEALER concerning the subject matter hereof and supersedes all prior and contemporaneous agreements between the parties.  This Agreement may be amended only by an instrument in writing which expressly refers to this Agreement and specifically states that it is intended to amend this Agreement.  No party is relying upon any warranties, representations or inducements not set forth herein.

7

16.0 All parties executing this Agreement represent and warrant that they have the right and authority to execute this agreement and that all principals, owners, major shareholders or others with a significant interest have been informed as to the contents of this Agreement.

Technical Support Group:
Executed this _____ day of _____, 1996 at (County, State)_____

_____

Printed name:_____


_____ DEALER Name
Executed this _____ day of _____, 1996 at (County, State)_____

_____

Printed name:_____

8

Appendix A
Current Suggested Retail Pricing

|  | Peter | Tim |
|---|---|---|
| Basic 8 | $ 399 | ok |
| Basic Plus | $ 699 | ok |
| Professional | $ 999 | $ 1,495 |
| Professional Plus | $1,995 | $ 2,495 |
| Elite | $4,995 | ok |

Basic 8 and Basic Plus are unlimited multi-user

Professional, Professional Plus and Elite require multi user licenses
per 5 user license pack          $495

Modifications are available for Basic 8 through Professional from
Elite Dealers and Developers via Elite Dealers

Source Code is available for Professional Plus and Elite
Professional Plus          $ 1,000
Elite          $ 2,000

9

# CIVIL COVER SHEET

FILED

civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM)

**I (a) PLAINTIFFS**
TIM WRIGHT, an individual
THE SUPPORT CENTRE, a
partnership, et al.

**DEFENDANTS**
TECHNICAL SUPPORT GROUP, INC., a Virginia corporation: SOFTWARE SOLUTIONS, INC., a business entity, form unknown: PETER LAVERGNE dba SOFTWARE SOLUTIONS, INC.: PETER LAVERGNE, an individual: SHAWN CORRIVEAU, an individual

'98 APR 14 1998

U.S. DISTRICT COURT

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT __Virginia__
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
714/450-0662
WELLMAN & WARREN LLP
4 Venture, Suite 325
Irvine, California 92618-3325

**ATTORNEYS (IF KNOWN)**
SCOTT W. WELLMAN
SHANNON G. MATHEW

'98 CV 0709 LEG (POR)

**II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)**

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)**
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☒2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☒5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

BREACH OF CONTRACT - 28 U.S.C. Sections 1332
FRAUD, UNFAIR BUSINESS PRACTICES, etc.
28: 1331bc et

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury- Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☒ Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | ☐ Security Act | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 555 Prisoner Conditions | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

- ☐ 1 Original Proceeding
- ☐ 2 Removal from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23

DEMAND $

Check YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**
JUDGE   Hon Judith Keep   Docket Number 97-CV-1431-K

DATE   April 13, 1998
SIGNATURE OF ATTORNEY OF RECORD

# 037915

